COMMERCIAL NAT. BANK v. NACOGDOCHES COMPRESS & WAREHOUSE CO.

(Circuit Court of Appeals, Fifth Circuit. December 19, 1904.)

No. 1,372.

1. ESTOPPEL—FAILURE TO SPEAK OUT—INDUCING RELIANCE ON FORGED RECEIPTS.

Plaintiff was engaged in the banking business, and received from a depositor warehouse receipts for cotton, ostensibly issued to the depositor by defendant, as collateral for a loan to the depositor. It thereupon wrote to defendant, stating that it had accepted the receipts as covering the transfer of the cotton. The receipts were forgeries, and the depositor had no cotton in warehouse corresponding with them; but defendant, knowing that the receipts were forgeries, or at least that there was no cotton corresponding therewith, made no reply to the letter until after the depositor had failed, and its deposit with plaintiff, which it could have retained to reimburse itself, had been considerably diminished. *Held*, that defendant was liable in damages for plaintiff's loss, on the theory of estoppel, in having remained silent when it knew that plaintiff was relying on the forged receipts, until plaintiff's position with respect to its depositor was altered for the worse.

McCormick, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Eastern District of Texas.

This action was brought by the Commercial National Bank, a corporation chartered under the national banking act, against the Nacogdoches Compress & Warehouse Company, a corporation created under the laws of the state of Texas. The plaintiff claimed that it had been damaged in the sum of $20,000 by reason of the facts hereinafter stated. The trial court

instructed the jury peremptorily to return a verdict for the defendant. The plaintiff brings the case here, and this action of the court is assigned as error.

To make the point involved appear, it is necessary to state the facts, to some extent, which appear in the pleadings and in the evidence presented on the trial:

The plaintiff was engaged in the banking business in New Orleans, and A. Wettermark & Son, of Nacogdoches, Tex. (a firm composed of A. Wettermark and B. S. Wettermark), kept a deposit account with the bank previous to and during the months of December, 1902, and January, 1903. On December 23, 1902, the bank received from Wettermark & Son two warehouse receipts as collateral to secure a note for $10,000, dated December 18, 1902, payable 30 days after date, and signed by A. Wettermark & Son. The two warehouse receipts were estimated to be worth $16,000, and were as follows:

"Nacogdoches Compress & Warehouse Company.

"Jan'y.
"Shipment.                                    Nacogdoches, Texas, Nov. 30, 1902.
            "Received of D. T. Iglehardt & Co.,

"One hundred ———— bales of cotton for account of A. Wettermark & Son.
        "[Signed]                        Nacogd. Compress & W. H. S. Co.,
                                              "Per Baldwin, Superintendent.

"Marks:
"L. O. U. P.
"Insured.
        "[Indorsed]                              A. Wettermark & Son."
    And:

            "Nacogdoches Compress and Warehouse Company.

"Jan'y.
"Shipment.                                   Nacogdoches, Texas, Nov. 28th, 1902.
            "Received of C. Volman,

"Three hundred ———— bales cotton.
        "[Signed]                        Nacogd. Compress & W. H. S. Co.,
                                              "Per Baldwin, Superintendent.

"Marks:
"C. O. D. E.
"Insured.
        "[Indorsed]                              A. Wettermark & Son."

They were indorsed in blank by A. Wettermark & Son. B. S. Wettermark, the junior partner of the firm of A. Wettermark & Son, was the secretary and treasurer of the defendant warehouse company. The record shows, without dispute, that these warehouse receipts were forgeries, and it tends to show that they were forged by B. S. Wettermark. After receiving these warehouse receipts the plaintiff bank, acting under the advice of its counsel, wrote the defendant warehouse company the following letter:

"The Commercial National Bank,

"New Orleans, Dec. 23, 1902.

"The Nacogdoches Compress and Warehouse Co., Nacogdoches, Texas— Dear Sirs: We beg to advise you that we hold compress receipts issued by your company, dated Nov. 28, 1902, for 300 bales of cotton marked 'C. O. D. E.,' and dated Nov. 30, 1902, for 100 bales cotton, marked 'L. O. U. P.,' said cotton being held for account of A. Wettermark & Son, and by them blank endorsed.

"As these receipts do not state that this relative cotton is held subject to the return of the receipts, we beg to notify you that we have accepted them as covering the transfer of the cotton.

"Please advise us if we are correct, and oblige,
        "Yours truly,                        J. H. Fulton, Manager."

This letter was duly posted, and was received certainly not later than December 26, 1902, by E. E. Baldwin, superintendent and manager of the defendant company, who handed the letter to B. S. Wettermark. At the time

this letter was so received by the defendant company, both Baldwin and B. S. Wettermark knew that the warehouse company did not have 300 bales of cotton marked "C. O. D. E." and 100 bales marked "L. O. U. P.," as described in the warehouse receipts. B. S. Wettermark undoubtedly knew that the warehouse receipts were forgeries. On or about January 3, 1903, Wettermark & Son failed in business. Early in January, and probably on the 7th day of January, an attorney representing the plaintiff bank had an interview with E. E. Baldwin. He showed the warehouse receipts to Baldwin, and Baldwin said that they were forgeries. He then showed Baldwin a copy of the letter written by the plaintiff bank to the warehouse company on December 23, 1902, and asked Baldwin how it happened, if these warehouse receipts were forgeries, that he had not replied to this letter. Baldwin stated (this witness testified) that he wanted to answer the letter, and spoke to B. S. Wettermark, the secretary of the company, and that Wettermark told him not to do it. This witness further testified: "Mr. Baldwin admitted to me that he knew the document was a forgery, and that he was compelled by Mr. Wettermark's instructions not to notify the bank, although he (Baldwin) knew these receipts were forgeries at the time." The evidence of two other witnesses for the plaintiff, while it did not show that Baldwin admitted that he knew the warehouse receipts were forgeries at the time he received the letter of December 23d, showed that Baldwin did admit that at that time he knew that there was "something wrong" about the warehouse receipts, and that the warehouse company did not have 400 bales of cotton marked as shown by the warehouse receipts.

Neither B. S. Wettermark, the secretary, nor E. E. Baldwin, the superintendent and manager, of the warehouse company, by telegram or letter, notified the plaintiff bank that the warehouse receipts were forgeries, nor did they give it notice that the warehouse company did not have the cotton described in the receipts, nor did they answer the letter received by them from the bank, of date December 23, 1902. After the interview, however, with the attorney of the plaintiff bank, Baldwin wrote the following letter, which was received at the New Orleans post office January 10, 1903, to wit:

"Office of

"The Nacogdoches Compress and Warehouse Co.

"E. E. Baldwin, Superintendent.

"Nacogdoches, Texas 1-7, 1903.

"The Commercial Nat'l Bank, New Orleans, La.—Dear Sir: Letter you refer to was handed to B. S. Wettermark who was Secy. and Treas. of Compress as I knew nothing of this transaction, the Wettermark Bank failed in few days and it now transpires several fraudulent tickets are standing out, having some 1100 bales all ready presented and some 3350 bales reported us by wire.

"Without a doubt your tickets are forged.

"Yours truly,

"[Signed]                                        E. E. Baldwin, Supt."

Having stated the evidence which showed the forgery, and tended to show the time that the forgery came to the knowledge of the warehouse company, and that showed the conduct of the officers representing the company after they obtained knowledge of the forgery, we will now state the evidence which tends to show the effect that this conduct had upon the interests of the plaintiff bank: The $10,000 note of A. Wettermark & Son held by the plaintiff bank has never been paid. At the time this suit was brought, A. Wettermark owed the bank on this note and other claims $13,510.69, with interest to be added. The account of A. Wettermark & Son for the months of November and December, 1902, and January, 1903, as itemized, showing debits and credits, was offered in evidence. The account shows that when the $10,000 note was discounted by the plaintiff bank, and the warehouse receipts received by it, the amount of the note was immediately placed to the credit of A. Wettermark & Son, and drawn out by their checks, and that on the 24th of December, 1902, the account showed that Wettermark & Son had overdrawn their account $27.56. On the 26th of December, however, they made

other deposits in the bank, and their account showed a balance in their favor of more than $7,000. Subsequently they overdrew their account again, but made other deposits, and on January 2, 1903, the balance to their credit was $6,828.96. On January 5th the amount still remaining to their credit was $4,269.87. This sum was drawn out of the bank by several checks, and the account shows that on the 27th of January it had been overdrawn $54.54. Mr. Fulton, the general manager of the plaintiff bank, who produced the statement from which the foregoing figures were taken, testified: "The statement attached shows the condition of the account [meaning the account of A. Wettermark & Son with the bank], and by reference to it you will see that as late as January 2, 1903, we could have retained $6,828.96, which amount was at their credit."

Edwin T. Merrick, Ben B. Cain, and W. Frank Knox, for plaintiff in error.

Seth W. Stewart and J. A. Templeton (Blount & Garrison, on the brief), for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge, having made the foregoing statement of the case, delivered the opinion of the court.

That it was wrong for Baldwin and B. S. Wettermark to remain silent under the circumstances, no just man can deny; and, if such wrong caused injury to the bank, a jurisprudence would be defective that afforded no remedy. If we were without precedent in cases, general principles would authorize relief, for the law can ask no better justification than the instincts of all just men. It would be a most unreasonable and unjust rule to permit the active managers and officers of a warehouse company, who knew that a bank was relying upon its forged receipts, to remain silent and not divulge the fact until the condition of the bank was altered for the worse. The law condemns not only active misrepresentation, but it imposes such activity as is requisite to reasonable social conduct; condemning negligence and requiring a measure of prudence to avoid injuring others. "A good example of duty," says the learned author of a recent work, "is to be found in cases in which a man, finding that his name has been forged, neglects to notify the victim until after his position (by the death, escape, or bankruptcy of the forger) has been changed." Ewart on Estoppel (1900) 41. The general principle that the negligent failure to act, when it causes injury to others, creates an estoppel, was announced and applied by the Supreme Court in Leather Manufacturers' Bank v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811; and the House of Lords in McKenzie v. British Linen Co., 6 App. Cas. 82—a case in which the bank's position not having been altered by the wrong prevented the estoppel—announced the rule that "a person who knows that a bank is relying upon his forged signature to a bill cannot lie by and not divulge the fact until he sees that the position of the bank is altered for the worse." The same principle, under varying circumstances, has been often applied. Ewart on Estoppel (1900) pp. 135, 136, and cases there cited.

We do not find that the learned trial judge, in his instructions to the jury, said anything that conflicts with the principles that we have announced. He directed a verdict for the defendant, because,

in his opinion, the plaintiff "had not shown that he was injured by the silence of the defendant." The facts as they appear in the record do not, we think, authorize the court to decide, as matter of law, that the plaintiff was not damaged by the conduct of the defendant.

As the case is to be tried again it is well for us not to discuss at length the facts, but, without referring to other probable results of the failure to give notice of the forgery, it seems evident, on the evidence as it appears in the record, that, if the warehouse company had answered the letter of the plaintiff with reasonable promptness, there were such dealings between the bank and Wettermark & Son that the former might have recovered some of its loss. It is true that, if information of the forgery had reachêd the bank on December 24th, Wettermark & Son then had no funds in the bank; but a few days later, on January 2d, they had to their credit more than $6,000.

The judgment must be reversed, and the cause remanded for a new trial.

McCORMICK, Circuit Judge, dissents.